May it please the court, my name is Patricia Bisswanger. I represent the appellant in this matter who was also the appellee in the cross appeal, and that's the County of Delaware and the Township of Tinicum. I'd like to reserve three minutes for rebuttal. Ms. Grannon. Thank you. We request that this court reverse the decision of the trial court because the trial court erred in holding that the presumption against preemption was overcome and that the state statute in issue here was therefore preempted when the land sought by the city was strictly intended for the convenience of an auxiliary use and was not necessary for aviation safety or any other federally regulated area. Counselor, tell me how the statute here, 14161, pertains to the purchase of land from homeowners for a UPS facility. The statute talks about the acquisition of land which may be necessary and desirable for the purpose of establishing and maintaining municipal airdromes or aviation landing fields. We're not talking about the purchase of land for a municipal airdrome or a landing field, are we? Well, actually, that's our position, Your Honor, that the city is not purchasing this land for purposes of a, you know, the runway. They're purchasing it for the UPS. The UPS is an auxiliary use to the airport, and so for the purposes of this statute... ...necessary and desirable, what do we have in the record to show that this is really necessary? In fact, the record of decision, which I know came out after Judge Pollack issued his opinion, talks about the fact that if this is reversed, they'll find another way to do it. There's a specific footnote. What do we have in the record? I'm sorry. Can you rephrase the question, Your Honor? I'm not sure. All right. First of all, the question is how does the statute apply? Secondly, you say it's necessary, but I'm saying I don't see in the record the necessity of putting the UPS facility there. There's specific reference in some of the documents here to the effect that if this is reversed, they'll find another way, and perhaps if there's reference on page 56 of the record of decision, if UPS decides to relocate elsewhere, we don't know that. The city says there are other avenues if it's reversed. Why does this statute apply on its face or lacking record evidence of necessity? The city has maintained throughout this litigation, Your Honor, that this piece of land is indeed necessary to accomplish the CEP, the capacity enhancement plan or program, excuse me. And so the city has maintained our enrollment. It's an absolute necessity because they have, right now, UPS is located along the waterfront in an area where the city wants to build a new runway. But that transaction's not an issue. The purchase of that aspect has been agreed upon. Right, and so they're looking for a place to which they can relocate the UPS cargo facility. So it's in the city's position that it's necessary to the airport. They've maintained that throughout these proceedings. Do the airplanes drive up to the cargo facility? I believe, I'm not an expert in this at all, but I believe that in Philadelphia they approach as close as they can. They're offloaded on the trucks and the trucks are offloaded into the cargo, into the cargo facility itself. My understanding, this is not on the record, but in Louisville, Kentucky, where UPS has built its state-of-the-art facility, the planes pull right up to the cargo and they're offloaded without the need of that intermediate step. Which we don't really know, though. We don't have in the record the relationship between the runway and the airport operations and the UPS facility. I only mention it by way of background. My understanding is that's what they want to build in Philadelphia, something like what they have in Louisville. Will you describe what is proposed for the relocation as an amenity, and I suggest that if the planes were to be pulling up to the facility, it might well be more than an amenity. Oh, I see you're on this point. I'm sorry, I misunderstood. I have a very basic question. Where is UPS in this litigation? What is UPS's position? Are they just going to wake me when it's over? Or what is its position? In the record of decision, UPS had said that it intends to relocate to a new location west of the airport in Titicum Township without any loss of jobs. Is that the alternative A location? That is the alternative A location, but there's nothing in the record to suggest that UPS has actually agreed to this plan. What is its position? UPS has not taken any position in this litigation whatsoever. Now, it owns the land where it currently is. Actually, the land is owned by a private company in the UPS leased city. I think it's Panty Island Corporation. Wow, I saw in the record that they own the land. I think Judge Pollack may have said that, but the fact is, I believe it's owned by Panty Island, and they have a long-term lease. So that's purchased from the leaseholder? The landlord? When the city purchases the land for the runway, they have to purchase it from the landowner, not UPS. I believe it's Panty Island Corporation. And then the city would be purchasing, wants to purchase, all these housing units and businesses from the owners for UPS, a private company? Yes, Your Honor, 72 homes and 80 businesses. We don't really know. What is the city's legal obligation to do anything for UPS? I'm not aware of any, Your Honor, and there's nothing in the record that would tell us one way or the other. But if they want to do something for UPS, and UPS wants something done for them, and they've got 72 homeowners and 80 small businesses who want to sell, which seems to be the case here, we're not talking about condemnation, we're talking about purchase, right? What is Tennecom's issue if the city wants it, and UPS wants it, and 72 homeowners and 80 small businesses want it? Well, there's nothing in the record, Your Honor, that would tell us, even though Judge Pollack seemed to take it as a given, and the city takes it as a given, that these would be willing sellers. But there's nothing in the record to support that, and there's no official transaction to support that. And the mere fact that I'm standing here on behalf of Tennecom, telling you that at least the majority of the people of Tennecom do not want this. I mean, there was a phrase, eviscerate a neighborhood. Yes, Your Honor. I mean, that's your phrase from your brief. Yes. I think my first question to your friends across the aisle, define willing sellers for me, because I've seen that phrase used in their briefs a number of times, and it's not my impression on the record that anybody here is willing. And if they're willing, why doesn't UPS just buy the land and skip the city? That's a good question. I don't know the answer to that. Your Honor, let's pursue what you've said. The fact that you're standing here shows they're not willing. At this juncture, the only thing we have before us is the city's assertion that they intend to buy, which implies a willing seller, right? I mean, they didn't say we intend to condemn. They said the transaction that's at issue right now is a purchase, and Tennecom is saying you may not purchase. So my question to you is, does it make a difference to the township whether these people want to sell or not, or is the township's position, hey, this is our tax base, to heck with you guys? The township's position is, yes, it's our tax base. Yes, it's our neighborhood. The airport already occupies one-half of Tennecom's land mass. Tennecom has about 7.6 square miles. The airport is already 3.8. They want to take over another, like, roughly 20% of Tennecom with this project. So they are just as like a death of a thousand cuts. You know, they're taking Tennecom apart. And Tennecom is, and I don't know if you're all familiar with it, but it's a very cohesive, very strong community of multiple generations of people who live there years and years and years. They buy their grandparents' homes. They live there forever. They don't want to move. All right. So we don't have anything in the record. One thing or another, right? Okay. What's the 84 Act have to do with this? We sent you all a letter and asked, please comment on this Aviation Zoning Act, Pennsylvania's enactment in 1984. What can you tell us about the township's view on how, if at all, that bears on this dispute? And it was actually a very interesting question. So we looked at the section, the 5920, is in the context of the 1984 Act, the Airport Zoning Act. The Airport Zoning Act is meant to eliminate airport hazards and specifically tall buildings, tall trees, whatever. It might be on adjacent properties and it might prevent a clear approach or landing for, or takeoff or landing. What does it actually say? I recognize you have a view on what it's for, but what does the Act actually say? The Act actually says that, and bear with me because I had to blow up because my eyes are so bad. I can hardly see it. The Act actually says that in any case in which it is desired to remove, lower, or otherwise turn in a nonconforming structure or use. And, again, I understand in the context of this Act to mean anything that's tall enough that it presents a hazard for takeoff and landing. Right, but there's a board that comes after that, right? Right. Or the approach protection necessary cannot, because of constitutional limitations, be provided by airport zoning regulations. And, frankly, I'm not quite sure what that means. And another award. Or it appears available, advisable, that the necessary approach protection be provided by acquisition of property rights rather than by airport zoning regulations. The municipality within which the property or nonconforming use is located or the municipality or municipal authority owning the airport or served by it may acquire by purchase, grant, or combination. Okay. Now, let me stop you there for a minute. Let me ask you if that last or clause, the one, it appears advisable that the necessary approach protection be provided by acquisition of property rights has some bearing on this. I don't believe it does, Robin, because this is an Act that's concerned with airport hazards. Well, let me change that. It has bearing on this matter in the sense that this is also related to airport safety. And it shows that the surrounding municipalities and the, or I should say the local governments retain some degree of authority over safety issues when it's within their dominion, local laws, zoning, land use regulations. So it shows that that can be accomplished within the context of state laws. Does it say that municipalities, if they think it's advisable to take care of an approach that is, and I understand it to be a runway takeoff or landing approach, that they can go ahead and acquire that land by purchase if they want? They can. And then again, this would be a safety related statute, which our core contention in this appeal is that the acquisition of property for UPS is not safety related. There's no limitation in here, is there, that says it has to be safety related? It just says it's deemed advisable. Deemed advisable, and I believe there's a, we can understand this to be in the context of the entire Airport Zoning Act, which is concerned with the establishment of airport hazard areas. So the airport has to determine where it finds that there might be hazards and then deal with them. And that's, we're not doing that here. They want a cargo facility. If 5920 does apply here, isn't the, doesn't the sentence in 5920 that states the acquisition of property be done, quote, in the manner provided by the law under which municipalities are authorized to acquire real property for public purposes, bring us right back to 141-61. That was my thought, Your Honor. Which is the manner provided by the law for Philadelphia to obtain land for purchases. Yes. Eminent domain. I would agree, Your Honor, and that if the city were proposing to buy this tract of land in Tinicum for safety reasons, and it proceeded under this statute, then that clause that Your Honor just quoted would say you can do it, but in conjunction with 141-61. Let me get back to where we were in terms of the new, the location of the new facility. I'd asked the question earlier on, will planes go up to the cargo facility, and there doesn't seem to be an answer. And nobody seems to know what UPS's position is, so how can we even begin to say that the location of the new facility has anything to do with safety as a matter of the record before us? I think that's a very good point, Your Honor. I don't see how we can. I mean, the city is proposing to take that over. Presumably, it's the capacity enhancement program, and it says in the capacity enhancement program, and if you look at the map, it's in the appendix at page 33, which is where this is situated, that this is the proposed or relocated UPS facility. But that's a capacity enhancement environmental study, correct? Yes, Your Honor. That's another good point, because the Vision 100 Act is an amendment to the FAA, the Federal Aviation Act. And the Federal Aviation Act, obviously, as everybody knows, is intended to preempt the area of air safety. But Vision 100 is strictly an economic and environmental act. Although, if the FAA is getting into that area, I mean, here we have a question of field preemption. How big is the field? And that's what it comes down to. I think that's exactly the question, Your Honor. And I think that what the city is proposing here, in effect, is that if we want it, it's preempted. If we had to say this wasn't, and I mentioned this in the brief, if they wanted to move a hotel or a parking lot or a fast food restaurant to get it out of the way of the proposed new runway, and they want to put that on the land that we're, you know, in Teecom, they would say it's necessary to effectuate air safety. That's not really a fair read of what the district court said, though, is it? And the district court said, whether you agree with it or not, the district court said this is a safety issue because if you don't relocate this and you try to move the UPS flights, then you're messing with air traffic in the United States of America. And moving a hotel or moving a parking lot doesn't do that. The district court was focused on UPS regular flights in and out of the Philadelphia airport and the need to manage that, wasn't it? I believe that's what the district court said. I noticed my time's up, but if I could finish this up. Please. Yeah, the district court did say that, and I think if I could paraphrase, that the UPS flights were calculated amongst the flights that have to be accommodated by this capacity enhancement. But, again, it's a line-drawing exercise, as Judge Barry mentioned, like where do we draw the line? It's blurred in the district court's opinion. The distinction between the runways and landing and taking off and the location of the new facility, there is a blurring. And I suggest that the blurring perhaps requires going back a conflict preemption because the district judge didn't really deal with that, and that may be where we need a record made. Okay. I think Your Honor is right, and if I could just close with one other observation. The district court, as much as I esteem that district court, I think they also mistook the holding in Burbank case and said this is controlling directly on point. Well, Burbank, the city was specifically saying no runway. You can't do it. And that's not the case. No taxiway, period. Exactly, and that's not the case here. That's not the case. It's not the case. So I see my time is up. Thank you, Your Honor. Good morning. Scott B. Lewis, a parent for the city of Philadelphia. I'd like to turn first to the state law issue and particularly the question of the application of section 5920 to the case. The city respectfully suggests that section 5920 has no application to this case. The city is not seeking and, in our view, could not seek to acquire under section 5920 the land it needs in Tampa for the relocation of UPS that is associated with the runway projects in the CEP. Section 5920 has a limited purpose. It only authorizes the acquisition of air rights and similar interests and property that are required to provide necessary aviation approach protection, as the Supreme Court of Pennsylvania made clear in Starkey. Okay. So if you say set-aside the 84 Act, let's set it aside. Your opponents say set it aside. You say set it aside. How do you get around the 1925 Act? Well, we have the paramount draw here. Prior to Home Rule, the 1925 Act would have been the source of the city's power to acquire by purchase land in Tennaco that it needed for the airport. But after Home Rule, that's no longer the case. The city has power under the Home Rule Enabling Act to acquire property anywhere that it wants to acquire property. And here the district court judge said, oh, wait a second. The Home Rule Enabling Act has in section 13133 a territorial limitation. It says a Home Rule city of the first class cannot exercise power or authority outside of its jurisdictional bounds without specific legislative authorization. And we're arguing, and we're arguing here very forcibly on the Supreme Court's decision in the Gutham case, that the ownership, the purchase and ownership of property in Tennaco for the airport does not implicate the exercise of governmental power or authority. That's what they held in that case. It was a venue case. It was a venue case. It was a two-page venue case. That's your best case? It is a case which holds explicitly and we think consistent with well-established doctrines of municipal law that distinguish between the exercise of sovereign power and the exercise of proprietary powers. The court recognized in Gutham that the mere ownership of property outside of the city's bounds does not implicate the exercise of sovereign power. It's purchased just like a third party would be a purchaser, correct? It's the ability to buy and sell, whether that's exertion of power or authority. I mean, that's the best argument, is that arguably it is not. It is not. And we believe the Supreme Court's holding in Gutham is correct and establishes that as a matter of law and it's consistent with, as I say, well-established decisions. What do you say, how can you reason that the enactment of home rule renders the 1921-25 statute, throws it out the window? It was a very specific provision putting a caveat on the city's ability to purchase in other locations and it would seem to be tailor-made for just this specific authorizing Philadelphia. Talk about municipal air drones or aviation landing fields. I mean, it seems to me. I understand, but let's remember that before home rule, all the cities in Pennsylvania, including Philadelphia, had to point to specific legislative authorization for the removal of all of their powers. And so in 1925, the state legislature conferred conditional power on the city of Philadelphia to acquire land in other jurisdictions for airport purposes and it was conditioned consent. And when the home rule legal act is enacted and then became granted through the home rule charter in Philadelphia, that became the source of the city's power. And in section 13111 of the Home Rule Enactment Act, to the extent there remained on the books of the statutes of the Commonwealth of Pennsylvania provisions that were inconsistent with a properly enacted home rule charter, they were repealed. Let me also respond to this language from 13111 if you would. It says, no city shall exercise any powers or authorities beyond the city limits except such as are conferred by an act of the General Assembly. Now, if the General Assembly has conferred power with regard to airports in a very specific targeted way and the Home Rule Enabling Act has this limitation within it, by what reason would we assume that they really meant sub silencio to be throwing the 25 Act out? Well, because that's really at the root of what it means to have a home rule. When the legislature enacted the home rule... To gain any land anywhere you want? No, it's not limited to land. It changed the paradigm under which municipalities sourced their powers. So prior to home rule, a municipality had to point to specific legislative authorization for everything that it did. This is one of many statutes that the city of Philadelphia would have relied on before the Home Rule Enabling Act was enacted and the charter was adopted. But once Philadelphia became a home rule city of the first class, it no longer needs to point to specific legislative authorization for the things that it does. Among the things that it does not need to point to is Section 1416Y. I'm not getting through because I'm not talking about them having power. I'm talking about a limitation on their power. That's the question I'm trying to ask, but I'm evidently not asking you successfully. Let me try it again. No, let me try it again and then you try it again, all right? It says to the extent there are limitations, you have to look at that. That's what it seems to say when it talks about limitations. So even if it granted them broad powers, what is the meaning of the reference to limitations in the Enabling Act? The Enabling Act limits the exercise of power or authority. And so, again, we are asserting that the root of the power or authority, this is not an exercise of power or authority when the city goes forward, so it's not prohibited by the provision barring the exercise of power or authority, extraterritorial, without specific legislative authorization. Would it be different if you were condemning this property? Yes, if you were condemning the property, because that would be the exercise of sovereign authority, the city wouldn't have to look to specific legislative authorization. In this case, we looked at 14161 and would need the consent of the statute or otherwise enforceable, but that's not what we're doing here. Okay, so let me ask you the question that was put to your colleague across the aisle there. There's nothing in the record about these being willing sellers, so why would we assume that? Well, that's not quite right. There's nothing in the joint appendix that's filed. As you may remember, Judge Pollack raised on his own a question of whether or not there was Article III jurisdiction here. And in connection with that, January 15th of 2010, the city filed various papers with the district judge in which we showed that, in fact, negotiations were ongoing, that there were potential sellers with whom the city was negotiating, that the possibility that sales would be invalidated if Kinnican or Wright had cast a cloud on those negotiations, and so the negotiations had been suspended pending the resolution of this case, and that is in the record. So that it is fair to say, at this point, there's no way of knowing whether 72 housing unit owners or homeowners and 80 businesses are willing sellers. That hasn't been conclusively determined through our best grip. You use it, though, in your brief. Throughout your brief, you're talking about the willing sellers. And the reason we do that, Your Honor, is because it's Tennant's position that even if we have willing sellers, that they have the power to veto the transaction by reason of what the law says. Well, that's another question. That's the second question. Let me go back to my first question that I had asked earlier. What is your position on UPS's position in this case? Well, UPS doesn't have a formal position in the case. It's not here. The city is negotiating with UPS and hopes to... Negotiating for UPS as to what? I mean, UPS, we learned this morning, doesn't own the land that they're going to take for the runway, the city's going to take for the runway. And the city is negotiating for a private company to buy these homes and businesses? Well, let's be clear. The entity that owns the property within the airport that's occupied by UPS is a legally distinct entity that's controlled by UPS. And the city is negotiating with that entity. Is that in the record? That's not in the record. And none of this ownership stuff is directly... Or contractual relationships or obligations of the city to do anything vis-à-vis UPS, correct? What's in the record is the FAA's determination that as part of the definition of this project, that one of the things that needs to be accomplished is to relocate UPS from the site it occupies today to a new site. And the new site is, in response to Judge Perry's questions, would be adjacent to the airport so that it's available for the airport to move. I don't think it says that it needs to relocate. I think the alternatives under the environmental assessment, the CEP, say that this is what would happen. I don't think there is any record statement of the... Well, what the FAA says is that the relocation of UPS is required in order to accommodate the construction of the new runway that's contemplated by the CEP and the statute. But yet UPS will have the runway. And then the definition of the CEP as articulated by the FAA calls for the relocation of UPS to this new site within 10 o'clock. But we don't know that there is any obligation, nor do we know that UPS wants to be relocated there, or that there is a deal that is contingent upon it. Or that there is anything in whatever location is chosen to do with airline safety, airport safety. Well, I'd like to come back to that because I think that, as we've expressed in our brief, it's inappropriate to carve out individual parts of the CEP. The CEP is a defined project, defined by federal law and determined to be a national priority. But that's an environmental study. What's the bearing on the project? Let me ask a question about another regulation, 14 CFR 157.7. Are you familiar with this? It's the Code of Federal Regulations, Notice of Construction, Alteration, Activation, and Deactivation of Airports. It's FAA determinations. It talks about an aeronautical study that is to be done by the FAA. As part of this regulation, it says, a determination does not relieve the proponent of responsibility for compliance with any local law, ordinance, or regulation, or state or other federal regulation. Do you know anything about this? This has to do with construction, alteration, activation, and deactivation of airports. It's not an environmental study, it's aeronautical. Let me come back to the environmental study because I think it's really important. Ordinarily, NEPA review is entirely process-oriented. And what happened in the Vision 100 Act is something that's qualitatively different. In the Vision 100 Act, what Congress did was to infuse this process with a distinctly substantive element. Unlike other kinds of projects that are subject to NEPA review, capacity enhancement projects at congested airports are projects in which the determination of need and purpose and the selection of the alternatives is given to the federal agency. The FAA is the entity that decides, in the course of review under NEPA, what the preferred alternative will be. And its decision is binding on all of the other jurisdictional agencies. So it's quite different. Mr. Wilson, the district court hinged its opinion, not the first part of its opinion, the state law one, but the preemption part of the opinion, on an assertion about safety. It said it goes without saying, basically, that this is a safety issue. Now, I may not have read it carefully enough, but I thought I read it pretty carefully, and I didn't see anywhere in the statement of purpose in the rule of decision or in the final environmental impact statement or even in the preliminary one any mention of safety. There's a lot of discussion of congestion and delay. There's never, I don't think, a mention of safety. How can we uphold the district court here, as you want us to on this point, on this question of safety, when it does not appear to have been a part of the administrative process at all? Well, I would suggest to you, Your Honor, that the nexus between capacity enhancement projects and congested airports, on the one hand, and safety, on the other, is actually something that's found in the congressional declaration of purpose of this statute and specifically in the provisions of 404, which referred the exercise of authority by the administrator of the FAA in expediting capacity enhancement projects on the fulfillment of the purposes of both the promotion of aviation commerce and the promotion of aviation safety. All capacity determinations are, by congressional definition, safety determinations. I would suggest that you remember that we're talking about a very specific kind of airport project here. We're talking about capacity enhancement projects at congested airports, and these are qualitatively different than redevelopment projects of a generic sort, so the sort, for example, that was considered in the World Park case. Well, I guess I'm just trying to get, if the administrative decision never mentions safety, is the city's position that it has to be safety because something that Congress said in the Vision Act makes it safety? Is that the argument? I would say that the intuitive appeal of that argument is very strong, as I think Judge Pollack stated. I think the congressional declaration of the relationship between these projects and safety is clear, and I would also suggest that even if this Court would find that the field preemption argument, which depends upon safety preemption, was wanting, that the Court could and should find as a matter of conflict preemption or optional preemption that the efforts by the township of Tinicum to interfere with, delay, and redesign this capacity enhancement project frustrates the congressional purpose which concludes in the State of North Carolina. There's no record on that, there's no record on that sufficient to deal with a conflict preemption issue, in my view. If you were talking about the piece of land where UPS is currently located, and that were the issue, if Tinicum were asserting the right to consent or not to that, that seems to me there's not a lot of record needed. You see the runway can't be shorter. But then you get to the homeowners and the attenuation of that from safety and the actual need that this one isn't going to happen unless this one happens as a matter of law or whatever. But we don't seem to have that connection. And I don't think we're willing after Ellisot, and in light of the way the Supreme Court is viewing preemption these days, to do, I mean, the district court kind of said FAA has touched this, has given it an imprimatur, therefore local ordinances go by the wayside. And I don't think we're, it's tough to do that without a record. And I would suggest that it's not. And the reason for that is that the congressional definition of capacity enhancement projects includes the acquisition of land that's associated with a runway project. There's no question on this record that the acquisition of the land for the relocation of UPS is associated with the runway. There's no question that the FAA's definition of the preferred alternative is binding. Mr. Scott, does that mean you're conceding the point that was made earlier by your opposing counsel there, that the city's position would be no matter what it was, if it was a hotel, if it was a parking lot, if it was a food court, that you'd be entitled to take Tenekum's land to relocate it? I think as a legal matter that might be the case. I think in this case the court doesn't need to get that far. How can that be? How can it be? And let me emphasize, Mr. Scott, that we're one step removed. We're not talking about taking the UPS terminal now. We're talking about taking the Tenekum land to put UPS someplace else. How can it be that the relocating, not the taking them away, but the putting them someplace else on Tenekum land, if it has nothing to do with airport traffic at all, if it's a food court, that that is something preempted by conflict under the FAA? I would suggest that here the difference is that the FAA, in defining the preferred alternative and exercising its statutory authority under the Vision 100 Act, has explicitly called for the relocation of UPS as part of the capacity enhancement project. If the FAA had not done that, we wouldn't be making that argument today. Then that leaves me to ask, the FAA is always, everywhere around the country, with expansion projects saying, look, if you can get this land, then we can do this. If you can get that land, we can do this. If the argument you're making is when the FAA conditions an expansion on local acquisition of land, something which the FAA, by its rules and regulations, specifically says, you've got to comply with local zoning, et cetera. If the FAA conditions the acquisition of land as part of an expansion project, can it really be the case that that ipso facto constitutes a preemption? Because if that's true, if it's a preemption, why bother saying you have to comply with local zoning ordinances? That just makes all that a charade. If once the FAA says you're going to need this land for this kind of project, then local people can come in and say, hey, it's all preempted. I would suggest that there's a distinction to be drawn here that's extraordinarily important between projects in general and those rare projects which have been found by Congress to be a national priority, which are capacity enhancement projects at congested airports. We're not talking about the generic FAA project. We're talking about a specific project that's subject to these very particular statutory amendments that were enacted in 2003. But let me understand the capacity enhancement. The city comes up with the project, correct? In conjunction with the FAA. And there are alternatives. Correct. And you're saying by virtue of the fact that something is put into that CEP, ergo, any local ordinance that might apply relating to that is preempted by virtue of the fact that there's a CEP. It's not preempted by an FAA regulation. It's not preempted by some law. It's because there's a CEP that has been chosen, whatever that provides for, every local and state ordinance that might, any hoop you have to jump through in order to do that goes away? That's right, because the FAA's determination of the purpose of the need and its selection of the alternative has been determined by Congress to be binding on state and local jurisdictions. So if there's a road within the airport that's a one-way street and it's proposed in the CEP that it become a three-lane highway and there are local requirements for that, notice, et cetera, everything goes away? It's all preempted by virtue of the fact that it's said it'll be a one-way street? Yes, but remember that the process of creating these programs, as the FAA describes in the correct environmental and final environmental and economic statements, involves an enormous amount of input from the state and local jurisdictional agencies. This isn't something that's just dropped down without any opportunity from local or state input. It's a process that embraces local and state input, and what Congress has said in the Vision 100 Act is when that entire process is complete, then we would argue we don't even know if UPS wants to go there. UPS may take your site and we're going somewhere else. Yes, we're going to move to Newark, New Jersey and set up our hub there. I mean, we don't even, you're doing all this, but there's no input as a matter of record from UPS. I mean, you could do this and they could turn around and tell you to take a hike. They're not going to stay. There's certainly no record that says that UPS needs to stay on airport land in order for there to be safety. I mean, all of your arguments about the importance of CDPs and their distinct character under the Vision Act, I'm having trouble connecting that with UPS staying on site. I can understand UPS moving off where it is. That makes sense to me. I'm not sure I'm getting how it's safety-related or how it's part of the expansion project that the FAA in its wisdom thinks needs to happen for safety reasons and congestion reasons that UPS stay on that land. Where's the link? Again, I'll try again, Your Honor. The FAA's definition of this capacity enhancement program, this particular one, includes provision for the relocation of UPS. UPS has to be moved where it is now for obviously safety-related issues. The project as a whole, we argue, is safety-related. And what the Vision 100 Act doesn't allow is for a local entity like Kennecum or Delaware County to mount a flank attack on a CEP and challenge the definitions of purpose and need or the selected alternatives that are binding that have been adopted by the FAA. So the FAA has defined what the CEP is. The definition of the CEP includes the relocation of UPS. The entire CEP is safety-related. And as we argued in our brief, it's inappropriate for adjacent municipalities to try to pick apart the CEP and challenge a particular person on the grounds that they're not safety-related. It's all safety-related because something somewhere in the Vision Act says congestion is safety-related. That's the city's position. Because safety doesn't rear its head at all in the rule of decision, does it? Well, I think there's a reason for that, which is really what Judge Pollack said, which is the relationship between airport congestion and delay and safety is beyond our control. It goes without saying. It really goes without saying. All right, thank you. Thank you very much. Just two quick comments if I may, Your Honors. Mr. Wilson just mentioned that the CEP was binding on local agencies because they had participated in the project. But I just remind the Court that this CEP was promulgated pursuant to the Vision 100 Act, which is, as the Court noted earlier, it's an environmental review process. And so the agencies that were involved in this process were not, typically in its capacity, you know, as protector of the neighbors. To the extent Tinicum had a role at all, it was as an environmental agency. But mostly what they involved was the Pennsylvania Department of Environmental Resources and agencies like that. So it was not, you know, the kind of review or the kind of scoping process that I think we might have been led to believe a minute ago. And the other point is that Judge Mandel brought up the 14 CFR 157.7A. And I'd just like to point out that that particular section of the CFR was cited by the Court of Appeals for the Sixth Circuit in the Gustafson. Okay, you got it. But I'm surprised you didn't argue Gustafson. It was a process that went a week down, I think. But, yeah, no, I thought Gustafson was very good with us. Could you respond to Mr. Scott's argument that these CEPs are a very different animal? This is not your average FAA airport expansion project. This is something undertaken pursuant to specific congressional enactment, the Vision Act. And it's all safety-related according to Congress. So that's why we are where we are. If one reads the findings that are in Section 304 of Vision 100, the findings all relate to capacity and getting as many planes in the air as possible. It frankly doesn't say anything about safety. Now, we all know that the FAA Act is the umbrella under which Vision 100 is situated. So maybe Congress thought it wasn't necessary. But the Vision 100 Act is all about expanding capacity, and it talks about enhancing commerce, economic benefit conferred on the nation by having an adequate and flourishing system of air transport. But it's not specifically directed to safety. And then the process that is prescribed under Vision 100 is intended to streamline the environmental review process. Because I'm sure the court's aware that in the past, projects would come up and then somebody would come along, like Mr. Wilson at Flank, attack and say, you know, there's some obscure species out there that's going to get hurt. You know, we have to stop this project. And so reading Vision 100, it's really clear that that's what they intended for a stall, those kind of crime attacks. It's all about the environment. They're going to streamline that process. Does your reading of the 1925 Act mean that the city is powerless to take the steps it thinks it needs to take here, the same to the CEP? Not at all. But the city does need to confer with the township and the county to obtain the township and the county's consent. So they cannot get your consent. I guess that's what it comes down to, is that just as a matter of law, is Tinicum entitled to say to the city and to the FAA, in effect, no, go away. I think under our system of federalism, they are indeed entitled to say that, Your Honor, because we have two competing interests here. We have Tinicum, which, and you all know in a democracy, the people speak most clearly through their local officials. And the local officials have empowered me to come here and speak out against this plan. And then on the other hand, we have the federal government that's looking at another picture, literally looking at things from 10,000 feet. And they are competing interests. But under our system of federalism, we still retain, under the Tenth Amendment,  It has always struck me that there is a political component working in this case, in light of the law. Your Honor, one thing I would point out is, and I guess you could characterize this as political, but when the airport comes in and takes over half your township and doesn't pay any taxes, and just walks away from the table, you're making people pretty vulnerable. I didn't mean to suggest that political is necessarily pejorative. Oh, well, thank you. So I think also the people of Tinicum, how did they come up here? Because they need some level of protection from this federalization in their lives. Thank you. In cases where I argue, take it under advisement. Thank you.